RUTH A. HARVEY
MARGARET M. NEWELL
LEAH V. LERMAN
CHRISTOPHER K. VANDEUSEN
leah.v.lerman@usdoj.gov
**U. S. DEPARTMENT OF JUSTICE**
**CIVIL DIVISION**
1100 L Street NW, Fl 7
Washington, DC 20005
(T) 202-307-0452
(F) 202-514-9163

Counsel for the United States

# UNITED STATES BANKRUPTCY COURT

## CENTRAL DISTRICT OF CALIFORNIA

## LOS ANGELES DIVISION

| | |
|---|---|
| In re<br><br>MYLIFE.COM, INC.,<br>        Debtor. | Case No. 2:22-bk-14858-ER<br><br>Chapter 11 Proceeding |
| UNITED STATES OF AMERICA,<br><br>        Plaintiff,<br><br>V.<br><br>MYLIFE.COM, INC.,<br><br>        Defendant. | Adv. No. _____<br><br>**THE UNITED STATES OF AMERICA'S COMPLAINT TO DETERMINE THAT ITS DEBT IS EXCEPTED FROM DISCHARGE UNDER 11 U.S.C. § 1141(d)(6)(A)** |

## <u>COMPLAINT</u>

The United States of America hereby files its Complaint seeking a declaration that a debt owed to the United States is excepted from discharge under 11 U.S.C. § 1141(d)(6)(A), and in support thereof, avers as follows:

### I. INTRODUCTION AND JURISDICTIONAL STATEMENT

1. The Court has jurisdiction over this proceeding pursuant to 28 U.S.C. §§ 157(b)(1) and 1334(b) as a matter arising under 11 U.S.C. § 1141(d)(6) and in *In re MyLife.com, Inc.*, 2:22-bk-

1  14858-ER, a Chapter 11 case filed in the United States Bankruptcy Court for the Central District

2  of California, Los Angeles Division. Plaintiff United States consents to entry of final order or

3  judgment by the Bankruptcy Court.

4    2. Venue in this district is proper pursuant to 28 U.S.C. § 1409(a).

## II. BACKGROUND

3. The debt MyLife.com Inc. ("MyLife") owes to the United States is excepted from discharge under 11 U.S.C. § 1141(d)(6)(A).

4. In a suit brought by the United States in 2020, the U.S. District Court for the Central District of California ("District Court") held that MyLife committed violations of consumer protection laws prohibiting deceptive practices.

5. The District Court held that MyLife obtained over $28 million through deceptive trade practices.

6. The District Court made factual findings and legal conclusions in its Summary Judgment Order sufficient to satisfy the elements of the fraud exceptions to discharge of 11 U.S.C. § 523(a)(2)(A).

7. MyLife also agreed in a Stipulated Order (defined below) after the Summary Judgment Order that all factual allegations in the District Court Complaint (defined below) are true for purposes of determining dischargeability of its debt to the United States in any bankruptcy.

8. The same Stipulated Order provides specifically that the District Court Complaint's allegations suffice to establish non-dischargeability under section 523(a)(2)(A) of the Bankruptcy Code and that the Stipulated Order has a collateral estoppel effect for that purpose.

9. The same elements for establishing an exception to discharge under section 523(a)(2)(A) for an individual debtor establish an exception to discharge for a corporation reorganizing in chapter 11 under 11 U.S.C. § 1141(d)(6)(A).

10. MyLife's debt to the United States is excepted from discharge under 11 U.S.C. § 1141(d)(6)(A).

## III. PARTIES

11. Plaintiff United States of America (the "United States" or the "Government") is a creditor in the bankruptcy case referenced above.

12. Defendant MyLife.com, Inc. ("MyLife" or the "Debtor") is a corporate entity organized under the laws of the state of California and is a debtor-in-possession under chapter 11 of Title 11 of the United States Code (the "Bankruptcy Code").

## IV. FACTS

### The United States's Lawsuit Against MyLife

13. On July 27, 2020, the United States filed a complaint ("District Court Complaint") against MyLife and its founder and CEO Jeffrey Tinsley ("Tinsley") in the District Court for relief for, *inter alia*:

   A. deceptive business practices in violation of section 5(a) of the Federal Trade Commission Act ("FTC Act"), 15 U.S.C. § 45(a),

   B. violation of the Telemarketing Sales Rule ("TSR"), 16 C.F.R. § 310.3(a)(1) – (2), and

   C. violation of the Restore Online Shoppers Confidence Act ("ROSCA"), 15 U.S.C. § 8403 (collectively, the "Consumer Protection Statutes").

14. The United States sought restitution, injunctive relief, and penalties against MyLife and Tinsley, instigating the case known as *United States v. MyLife.com, Inc. and Jeffrey Tinsley*, No. 2:20-cv-6692-JFW (C.D. Cal.) (the "District Court Action"). *See* Exhibit A, District Court Complaint.

### The District Court's Summary Judgment Order

15. The parties moved for partial summary judgment, and on October 19, 2021, the District Court granted the Government's motion as to three counts against MyLife, holding that MyLife:

   A. engaged in deceptive acts in violation of Section 5 of the FTC Act,

   B. made omissions and misrepresentations in violation of the TSR, and

   C. failed to provide simple mechanisms to cancel automatically renewing subscriptions in violation of ROSCA.

Exhibit B, Summary Judgment Order.

16. The District Court's Summary Judgment Order made many factual findings and legal conclusions about MyLife's deceptive and misleading actions, including:

<u>MyLife's Operations and Content</u>

A. MyLife operated a website containing profile pages about hundreds of millions of individuals. Exhibit B at 1.

B. To populate the information on the profile pages, MyLife purchased public record data about those individuals. *Id.*

C. The information on a MyLife profile page may include the individual's address, income, religion, ethnicity, net worth, or court records. *Id.*

D. MyLife displayed some information as "flags" on its profile pages. *Id.* at 1-2.

E. Those "flags" included assertions appearing on over 60 million individuals' profiles that the individual "DOES" have court, arrest, or criminal records. *Id.* at 2, 9.

F. Those assertions did not distinguish between criminal convictions (such as one for murder) and minor infractions (such as a traffic ticket). *Id.*

G. Some of those assertions may not have been accurate. *Id.* at 9.

H. MyLife's website displayed prominent red banners or "flags" on over 60 million individuals' profiles, declaring that the individual "DOES" have "arrest or criminal records" or "court, arrest or criminal records," which created the deceptive and misleading impression that those individuals have criminal records, even though the flags may not have been accurately matched to the profiles and could refer to something minor like a non-criminal traffic ticket. *Id.* at 9.

I. For individuals without a record "flag," MyLife's profile pages stated that those individual "may have" arrest or criminal records. *Id.* at 3, 9.

J. Those statements were included on profiles even where MyLife did not believe the individual had such records. *Id.* at 3.

K. MyLife claimed that on the more than 250 million profile pages that did not have a banner saying that the person "DOES" have a criminal or arrest record that the individual "may" have criminal or arrest records," creating the misleading and

-4-

|   |   |   |
|---|---|---|
| 1 | | deceptive impression that MyLife had information suggesting that such criminal or |
| 2 | | court records exist, when, in fact, MyLife had absolutely no information indicating |
| 3 | | that these individuals have any such records. *Id.* at 9. |
| 4 | L. | MyLife's derogatory and misleading statements about individuals' potential |
| 5 | | criminal and arrest records alarmed many consumers, and MyLife knew they |
| 6 | | induced or enticed consumers to purchase MyLife's services. *Id.* at 3, 10. |

<u>MyLife's Subscription Practices</u>

M. MyLife sold subscriptions to its website. *Id.* at 4.

N. MyLife used the information displayed on its profiles to induce consumers to subscribe to its services. *Id.* at 10.

O. Tinsley thought it was "f— amazing" that so many "flags" came back from a certain data acquisition in 2017, because this derogatory information about consumers provided "so much opportunity" for MyLife. *Id.*

P. MyLife represented that subscribers would be able remove information about themselves from third-party websites. *Id.* at 3.

Q. MyLife could not control the information displayed on third-party websites. *Id.*

R. MyLife told consumers that it would give subscribers the ability to remove their personal information from any place on the Internet where it appears, but MyLife was not actually able to force websites to remove information. *Id.*

S. MyLife knew that it could not control the information displayed on third-party websites. *Id.*

T. MyLife represented to consumers that individuals' profiles could not be removed from its website. *Id.* at 6.

U. MyLife could remove profiles from its website. *Id.*

V. MyLife misrepresented whether it could remove consumers' profiles from its website, telling consumers that profile pages could not be removed when in fact MyLife removed hundreds of thousands of such pages per year. *Id.* at 6.

W. MyLife knew that it could remove profiles from its website. *Id.*

|   |   |   |
|---|---|---|
| 1 | X. | Between January 2019 and December 2019, MyLife received at least 63,285 calls from consumers requesting to remove their profile from MyLife's website. *Id.* |
| 3 | Y. | MyLife provided conversation scripts for these calls to its agents. *Id.* |
| 4 | Z. | MyLife's scripts informed consumers that their profiles could not be removed. *Id.* |

<u>MyLife's Billing and Refund Practices</u>

AA. MyLife sold subscriptions of defined length, such as one-month and one-year subscriptions. *Id.* at 4.

BB. Some of MyLife's subscriptions included an auto-renew provision. *Id.*

CC. Under the auto-renew provisions, a subscription would automatically renew at its conclusion. *Id.*

DD. MyLife did not disclose these provisions to consumers unless the consumer inquired. *Id.* at 5.

EE. Some of MyLife's free trials included an auto-renew provision. *Id.* at 4.

FF. Under the auto-renew provisions, a subscription would be automatically purchased at the free trial's conclusion. *Id.*

GG. MyLife did not disclose these provisions to consumers unless the consumer inquired. *Id.* at 5.

HH. MyLife failed to disclose the material terms of its subscriptions, including their automatic renewal feature. *Id.*

II. MyLife instructed its agents to ask customers to try its service for "just one month" but to set their subscriptions to automatically renew. *Id.* at 10.

JJ. MyLife misled consumers into believing that MyLife's billing would cease at the end of a subscription's original term but continued to charge its customers beyond that term, unless and until customers cancelled their subscriptions. *Id.* at 13.

KK. MyLife represented to consumers that its subscriptions were non-refundable. *Id.* at 5.

LL. These representations included call scripts informing consumers that subscriptions were non-refundable. *Id.*

|   |   |   |
|---|---|---|
| 1 | MM. | But MyLife did give refunds to some consumers. *Id.* |
| 2 | NN. | MyLife gave refunds to consumers who mentioned "Magic Words" such as "FTC," |
| 3 |  | "Attorney General," "BBB", or "lawsuit." *Id.* |
| 4 | OO. | MyLife knew that its subscriptions were refundable. *Id.* |
| 5 | PP. | MyLife misrepresented its refund policies to consumers. *Id.* at 5, 6, 11, 14. |
| 6 | QQ. | Since January 2015, MyLife avoided paying at least $27,987,208 in refunds by |
| 7 |  | misrepresenting to consumers that it did not pay refunds. *Id.* at 6. |

17. The District Court held that MyLife and Tinsley gained $33,945,698 from consumers through its violations of the Consumer Protection Statutes. *Id.* at 16.

18. The United States asserts that the findings and conclusions set forth in the Summary Judgment Order are true and correct.

<u>The Settlement and Stipulated Order</u>

19. After the Summary Judgment Order, MyLife negotiated a resolution of both injunctive and monetary relief with the United States. Specifically, MyLife and Tinsley agreed to and signed a proposed consent order on November 16, 2021, and the District Court approved and entered the order (the "Stipulated Order") on December 15, 2021. Exhibit C, Stipulated Order for Permanent Injunction and Equitable Monetary Relief.

20. The Stipulated Order entered a monetary judgment of $28,945,968 against MyLife to be paid to the United States.

21. The Stipulated Order provides: "The facts alleged in the [District Court] Complaint establish all elements necessary to sustain an action by the [FTC] pursuant to Section 523(a)(2)(A) of the Bankruptcy Code, 11 U.S.C. § 523(a)(2)(A), and this Order will have collateral estoppel effect for such purposes." Exhibit C at 19 (§ VII.C).

22. The Stipulated Order provides: "The facts alleged in the [District Court] Complaint shall be taken as true, without further proof, in any subsequent civil litigation by or on behalf of the [FTC], including in a proceeding to enforce its rights to any payment or monetary judgment pursuant to this Order, such as a nondischargeability complaint in any bankruptcy case." Exhibit C at 19 (§ VII.B).

23. The District Court Complaint alleges that MyLife's business and sales practices included:

    A. Deceptively suggesting on its website that individuals had arrest or criminal records, sexual offenses, potential bankruptcies, liens, or legal judgments even when they did not have any such records, which was intended to and did deceive numerous consumers and cause them to purchase subscriptions they otherwise would not have, in order to see more information about the purported records.

    B. Making materially misleading and deceptive statements and omissions during telemarketing calls to prospective customers, including about the benefits of a MyLife subscription and about MyLife's cancellation and refund policies and practices, to induce consumers to purchase MyLife's services.

    C. Selling subscriptions without clearly and conspicuously displaying the terms of those sales, including the total amount due to MyLife and the fact that subscriptions would automatically renew and MyLife would continue billing customers until they took affirmative action to cancel the subscription, which misled consumers and induced them to purchase subscriptions.

    D. Making it difficult for customers to cancel automatically renewing MyLife subscriptions, including by requiring that cancellations be done by phone and subjecting some customers who called to cancel to long wait times, disconnected calls, uncooperative agents, and pressure to renew subscriptions, which resulted in some customers who wished to cancel subscriptions and stop MyLife's recurring charges being unable to do so.

    E. Making misleading and deceptive statements and omissions to customers who called MyLife to cancel their subscriptions, including false statements about the ease with which subscribers could cancel their subscriptions, the existence of an automatic-renewal feature, and the availability of refunds, in order to avoid cancelling subscriptions and/or providing refunds.

24. The United States incorporates the allegations of the District Court Complaint as if fully stated herein.

25. The Stipulated Order set forth a series of deadlines by which MyLife was to make installment payments of specified amounts by certain dates to the United States.

26. Under this payment schedule, MyLife was to pay a total of $16,000,000 by December 31, 2025.

27. The Stipulated Order provided that if MyLife made all specified payments up to December 31, 2025 and if other conditions were satisfied, the remaining amount of the judgment against MyLife would be suspended.

<u>MyLife's Failure to Meet the Payment Schedule</u>

28. MyLife made only two payments under the Stipulated Order's payment schedule, totaling only $3,166,666.66. *See* Exhibit D, Declaration of Giovan B. Aloisio.

29. MyLife did not make either of the payments required by the Stipulated Order to be made on or before September 30, 2022 ($1,166,666.66) and December 31, 2022 ($1,166,666.68). *See* Exhibit C at 11 (§§ VII.C.2-3) *and* Exhibit D.

<u>MyLife's Bankruptcy Case</u>

30. On September 2, 2022, MyLife filed a chapter 11 bankruptcy petition.

31. The meeting of creditors was first scheduled for October 6, 2022, later rescheduled twice, and took place on November 3, 2022.

32. MyLife's Schedule E/F lists the U.S. Department of Justice as having an "unliquidated," "contingent," and "disputed" unsecured claim in the amount of $12,833,333.34.

33. The amount of the Stipulated Order judgment that MyLife currently owes is $25,779,301.34 ("the USA Debt"). Exhibit D.

## V. RELIEF REQUESTED

### Count I

**MyLife, a Corporation, Owes a Debt to the United States that is Excepted From Discharge under 11 U.S.C. § 1141(d)(6)(A) because It Is for Money Obtained by False Pretenses, False Representations, and/or Actual Fraud**

34. The United States incorporates by reference the allegations made in the preceding paragraphs as if fully stated herein.

35. MyLife is a "corporation" as the term is used in 11 U.S.C. § 1141(d)(6)(A).

36. The United States is a "domestic governmental unit" as the term is used in 11 U.S.C. § 1141(d)(6)(A).

37. "[T]he confirmation of a plan does not discharge a debtor that is a corporation from any debt . . . of a kind specified in paragraph (2)(A) or (2)(B) of section 523(a) that is owed to a domestic governmental unit." 11 U.S.C. § 1141(d)(6)(A).

38. The USA Debt is excepted from discharge under 11 U.S.C. § 1141(d)(6)(A).[1]

39. 11 U.S.C. § 1141(d)(6)(A) provides that "the confirmation of a plan does not discharge a debtor that is a corporation from any debt . . . of a kind specified in paragraph (2)(A) or (2)(B) of section 523(a) that is owed to a domestic governmental unit."

40. The USA Debt is "owed to a domestic governmental unit."

41. The District Court ordered MyLife to pay the United States $28,945,968 under the Stipulated Order.

42. By reference to the kind of debt specified in section 523(a)(2)(A), 11 U.S.C. § 1141(d)(6)(A) excepts from discharge "a debt . . . for money. . . to the extent obtained by . . . false pretenses, a false representation, or actual fraud."

43. As stated in the Stipulated Order, "[t]he facts alleged in the [District Court] Complaint establish all elements necessary to sustain an action by the [United States] pursuant to Section 523(a)(2)(A) of the Bankruptcy Code, 11 U.S.C. § 523(a)(2)(A), and this Order shall have collateral estoppel effect for such purposes."  Exhibit C at 19 (§ VII.C).

44. The USA Debt is thus the kind of debt excepted from discharge pursuant to 11 U.S.C. § 1141(d)(6)(A).

45. Even absent MyLife's stipulation that the USA Debt is excepted from discharge and the District Court's order stating the same, the facts alleged herein establish that the USA Debt is excepted from discharge because it is a debt for money obtained by false statements, false representations, or actual fraud.

---

1. Section 1141(d)(6)(A) requires no action be taken by the United States to except the USA Debt from discharge.  The United States files this complaint solely because MyLife asserts that it could discharge the USA Debt under a plan of reorganization and it appears that declaratory relief may be necessary before MyLife will formulate and solicit acceptances to a plan.

46. MyLife made misrepresentations, fraudulent omissions, or engaged in deceptive conduct, including about:

    A. Whether individuals had court, arrest, or criminal records,

    B. Whether individuals may have had court, arrest, or criminal records,

    C. MyLife's ability to remove information from third-party websites,

    D. Automatic renewal of MyLife's subscriptions or free trials, and

    E. MyLife's subscription refund policies.

47. MyLife knew of the falsity or deceptiveness of its representations, omissions, or conduct.

48. MyLife intended to deceive consumers.

49. Consumers justifiably relied on MyLife's representations and conduct.

50. Consumers' reliance proximately caused monetary damages.

51. The USA Debt is for money that MyLife obtained through its deceptive business practices.

52. Accordingly, the USA Debt is a debt for money that MyLife obtained by false pretenses, a false statement, or actual fraud.

53. MyLife owes the USA Debt to the United States.

54. The United States has standing to assert that the USA Debt is excepted from discharge under 11 U.S.C. § 1141(d)(6)(A).

55. The USA Debt is thus excepted from discharge under 11 U.S.C. § 1141(d)(6)(A).

56. There is an actual controversy regarding whether the USA Debt is excepted from discharge because MyLife listed the USA Debt as "disputed," and has refused to acknowledge that the USA Debt is excepted from discharge in this bankruptcy.

**PRAYER**

WHEREFORE, Plaintiff prays for judgment in its favor, and against the Debtor:

    A. That the Court issue a declaratory judgment under 28 U.S.C. § 2201(a) declaring that the USA Debt is excepted from discharge under 11 U.S.C. § 1141(d)(6)(A); and

    B. For such other and further relief as the Court may deem just, proper, and appropriate.

| | | |
|---|---|---|
| 1 | DATED: March 6, 2023 | Respectfully submitted |
| 2 | | |
| | | BRIAN M. BOYNTON |
| 3 | | Principal Deputy Assistant Attorney General |
| 4 | | /s/ Leah V. Lerman |
| | | RUTH A. HARVEY |
| 5 | | MARGARET M. NEWELL |
| | | LEAH V. LERMAN |
| 6 | | CHRISTOPHER K. VANDEUSEN |
| 7 | | Commercial Litigation Branch |
| | | Civil Division |
| 8 | | U. S. Department of Justice |
| | | 1100 L Street NW, Room 7002 |
| 9 | | P. O. Box 875 |
| | | Ben Franklin Station |
| 10 | | Washington, D.C. 20044-0875 |
| 11 | | (202) 307-0452 |
| 12 | | -and- |
| 13 | | /s/ Zachary Dietert |
| 14 | | LISA HSIAO |
| | | ZACHARY DIETERT |
| 15 | | PATRICK RUNKLE |
| | | CLAUDE SCOTT |
| 16 | | Consumer Protection Branch |
| 17 | | Civil Division |
| | | U. S. Department of Justice |
| 18 | | 450 5th Street, N.W. |
| | | Washington, D.C. 20530 |
| 19 | | (202) 616-9027 |
| 20 | | ATTORNEYS FOR THE UNITED STATES |